IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2015

**STATE OF TENNESSEE v. RANDY CARY**

**Direct Appeal from the Circuit Court for Carroll County**
**No. 13CR8     Donald E. Parish, Judge**

_____

**No. W2014-01336-CCA-R3-CD  -  Filed November 10, 2015**

_____

A Carroll County Criminal Court Jury convicted the appellant, Randy Cary, of especially aggravated kidnapping, a Class A felony, aggravated rape, a Class A felony, aggravated assault, a Class D felony, and evading arrest, a Class A misdemeanor.  After a sentencing hearing, the trial court merged the aggravated assault conviction into the aggravated rape conviction and sentenced the appellant as a Range III, career offender to an effective sentence of 120 years to be served at 100%.  On appeal, the appellant claims that the trial court erred by denying a motion in which he requested that private counsel be allowed to assist with his trial, that the victim's injuries did not qualify as "serious bodily injury," and that his effective sentence is excessive.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Billy R. Roe, Jr., Camden, Tennessee, for the Appellant, Randy Cary.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Matthew F. Stowe, District Attorney General; and Beth Hall and Adam Jowers, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, Deputy Adam Meggs of the Carroll County Sheriff's Department (CCSD) testified that on October 15, 2012, he responded to a "domestic dispute" call at the home

of the appellant's mother on Old Stage Road. When he arrived, the victim, who was the appellant's wife, was at the front door and "had two black eyes that were swollen just about shut." He said she also "appeared to be in pain, distraught, afraid." The appellant's mother was there but the appellant was not. The victim told Deputy Meggs that she was going to try to get the appellant's mother to take her to another location. Deputy Meggs took photographs showing the victm's swollen eyes, marks on both sides of her nose, and bruising about her face.

Deputy Meggs testified that later that day, he received a call from the victim, stating that the appellant was at his mother's house. Deputy Meggs returned to the home, and the victim ran to the passenger door of his patrol car and tried to open it. Deputy Meggs rolled down his window and told her that his doors stayed locked, and the victim told him that the appellant was behind the house. As Deputy Meggs began to open his car door, he saw the appellant "look out [from] around the end of the trailer" and chased the appellant into the woods. The officer yelled for the appellant to stop and radioed that he was in a foot pursuit. Seven to eight other officers joined the search, but no one was able to find the appellant.

Deputy Meggs testified that the victim's car was parked at the mobile home and that another officer "disabled" the car so that the appellant could not escape in it. An audio-recorder was in the car, and Deputy Meggs collected the recorder as evidence. Deputy Meggs said that he knew the appellant but not the victim and that he went to a "burnt house" on Highway 424 because the appellant used to live there. Deputy Meggs then went to a "field road" off Highwy 424. He said that the field road "loop[ed] around through the woods" and that he found a crime scene on the road consisting of bloody paper towels and cigarette butts. The paper towels were on the side of the road that corresponded to the passenger side of a car, and the cigarette butts were on the side of the road that corresponded to the driver's side. Deputy Meggs collected the evidence and sent it to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for DNA analysis. He also collected buccal swabs from the appellant and the victim and sent them to the TBI.

On cross-examination, Deputy Meggs testified that he did not remember seeing blood on the victim's clothing. He offered to take her to the emergency room (ER), but she "just wanted to get out of there and go to another relative's." Deputy Meggs thought the victim's injuries were serious, but he could not force her to seek medical attention. He acknowledged that the victim said the appellant hit her but that the victim did not say the appellant sexually assaulted or kidnapped her. The victim also did not tell him that the appellant claimed he was going to kill her family, and she did not ask for protective custody. However, the victim was afraid the appellant would come back and hit her. When the victim called Deputy Meggs back to the residence, she said the appellant was

there, and it took Deputy Meggs fifteen to twenty mintues to return to the home. Deputy Meggs acknowledged that he had known the appellant since they were children.

On redirect examination, Deputy Meggs testified that the victim told him the appellant had a knife. On recross-examination, Deputy Meggs acknowledged that cigarette butts also were on the "passenger side" of the field road. However, he only collected the three butts that were on the "driver's side."

Corporal Michael Taylor of the CCSD testified that he responded to the victim's first call on October 15 and served as "backup" for Deputy Meggs. When Corporal Taylor arrived at the residence on Old Stage Road, the victim, the appellant's mother, the appellant's stepfather, and Deputy Meggs were there. The victim was standing at the front door and had several bruises on her face. Corporal Taylor said that the victim "wasn't completely frantic" but that she was upset and frightened. He returned to the home later that day, but the appellant had already run into the woods behind the mobile home. Corporal Taylor spoke with the victim and learned that her car was parked behind the trailer. The appellant had been driving the car, and the victim could not find the keys; therefore, Corporal Taylor disabled the vehicle by removing an ignition fuse from the fuse box. He also found an audio recorder on the driver's side floorboard and gave it to Deputy Meggs.

On cross-examination, Corporal Taylor testifed that the victim eventually found the keys in her purse, so he returned the ignition fuse. The victim was allowed to leave in the car with the appellant "still on the loose," and she never asked Corporal Taylor for protection for herself or her family. Corporal Taylor said he and Deputy Meggs were not concerned that the victim would help the appellant escape because they had seen the extent of her injuries and "felt like she was pretty well done."

Investigator Jackie Wallace of the CCSD testified that on October 15, she was on her way home from work when she heard over her police radio that the appellant was "back at the residence." Investigator Wallace went to the home of the appellant's mother and began searching for the appellant but never found him. Investigator Wallace later saw the victim putting gasoline into her car at a convenience store and advised her to go somewhere the appellant would not find her. She also advised the victim to get medical attention.

Investigator Wallace testified that the next day, she listened to the audio recording found in the victim's car. Afterward, she went to a "burnt" house on Highway 424 where the appellant had grown up and also checked a "field road" across from the house. Investigator Wallace explained that the field road "just circles right back into 424" and that she saw bloody paper towels and cigarette butts on the road. She stated that if a car

had pulled onto the road from Highway 424, the paper towels would have been on the passenger side, and the cigarette butts would have been on the driver's side of the car.

Investigator Wallace testified that on October 17, she and Investigator David Bunn interviewed the victim and photographed her injuries. The victim's eyes were black, and she had "severe" bruising on her face and a bite mark on her nose. She also had bruises on her arms. Investigator Wallace photographed two text messages on the victim's cellular telephone and read them to the jury. The first message, received from "'me,'" stated, "'[F***ed] your brother today. I'll be seeing you, rat.'" The message was received at 2:04 a.m. on October 17, and the appellant was not in police custody at that time. The second message stated, "'[H]ey, you didn't have to call the police. You didn't have to call the law, bitch. Hell, I thought you knew I was a ghost. Now it's my turn again. The next time you see me it will . . . already be too - [.]'" The message then ended. During the victim's interview, Investigator Wallace learned about threats the appellant had made toward the victim's family. After the interview, Investigator Wallace escorted the victim to the office of the Women's Resource and Rape Assistance Program.

Investigator Wallace testified that she also learned during the victim's interview that the appellant might be at a residence in Jackson. Investigators Wallace and Bunn went to Jackson, and officers from other agencies helped them "hit the residence." Investigator Wallace ordered the appellant to "[c]ome on out," and the appellant came outside. After Investigator Wallace apprehended the appellant, she told him, "I can't believe you didn't run." The appellant told her to "'[l]ook down,'" and Investigator Wallace saw that his ankle was swollen so that he would have been unable to flee. The appellant told her that he injured his ankle when he fled from the police on Old Stage Road. Investigator Wallace heard the appellant tell another officer that his hand also was broken. From her investigation, Investigator Wallace learned that this incident began at the Guest House Inn in Jackson when the victim rented a motel room there.

On cross-examination, Investigator Wallace testified that she did not interview the victim on October 15 and that her first contact with the victim occurred at the gas station. Investigator Wallace did not mention a kidnapping to the victim during the victim's interview on October 17. However, Investigator Wallace mentioned a sexual assault to the victim because she had listened to the audio recording found in the victim's car. During the victim's interview, the victim showed Investigator Wallace text messages she had received from the appellant but did not show Investigator Wallace any messages she had sent to the appellant.

Dr. Thomas Boyd Markle, a radiologist, testified that a CT scan of the victim's head and neck was performed on October 16, 2012. The scan showed no acute injuries, but the victim had sustained a "blowout fracture" to her right orbital bone. She also had

- 4 -

factures in her right sinus. Dr. Markle explained that sinus cavities normally were filled with air but that one of the victim's cavities was filled with blood. He stated that the dangers of blood in the cavity were the drainage of blood into the throat, vomiting, and aspiration. A small amount of air had escaped from the victim's sinus cavities, a non-sterile enviroment, into her orbital cavity, a sterile enviroment, which also created a risk of infection to the victim's right eye. Dr. Markle said that although he did not see the victim, he would have expected her to have had a severe black eye.

On cross-examination, Dr. Markle testified that the orbital fractures were characteristic of a high velocity impact. He described the impact as like "a baseball line drive hitting you right in the eye" and said that "a fist could do the same thing." He stated that the fractures would eventually heal or that the eye would adjust to them, and he acknowledged that the victim could "go back to normal."

Susan Buchanan, a registered nurse, testified that she was working in the ER at Gibson General Hospital on October 16, 2012, and treated the victim. The victim told Buchanan that she had been "beaten about the face and head" on October 14, and Buchanan saw severe bruising on the victim's head and neck. The victim's face and eyes were swollen, and she had scratches on the left side of her face. She complained of headache and dizziness, and she reported her pain as "[s]even out of ten." The victim stated that she was taking Xanax and Doxycycline, and Buchanan gave her a Toradol injection in her hip and a tetanus shot. Buchanan also gave the victim hydrocodone and Cipro pills to take home and prescriptions for those medications. On cross-examination, Buchanan testified that the victim did not say she had been sexually assaulted.

Dr. George Kevin Spanos testified that he treated the victim in the ER on Tuesday, October 16, and that she said she had been involved in a domestic assault. The victim had orbital nasal swelling, a human bite mark on her nose, and multiple abrasions on her face and arms. She complained of dizziness and "[m]oderate pain" and could not remember recent events such as whether she had been "dazed" or "black[ed] out" during the assault. The victim said she had been injured on Sunday, and Dr. Spanos ordered a CT scan of her head, face, and cervical spine due to her "racoon type appearance" and the swelling and tenderness of her neck. The scan revealed that the victim had multiple facial fractures and blood in her right maxillary sinus. Dr. Spanos diagnosed her with a "closed head injury meaning that due to the severity of the facial fractures that she would have had a post concussion syndrome." Because of her facial trauma, Dr. Spanos scheduled an appointment for the victim with an ear, nose, and throat physician. Dr. Spanos prescribed Cipro, an antibiotic; hydrocodone for pain; Toradol for pain; and a tetanus immunization. He explained that in "[c]ertain instances," the trauma to the victim's head could have been life threatening. He acknowledged that he thought she was fortunate to have survived the assault.

On cross-examination, Dr. Spanos stated that the victim's injuries were "severe" and that "looking at these types of injuries with injuries I've seen in the past, it was life threatening." He said that he tried to get the victim to go to "The MED" but that she refused and that he did not know if she ever saw the ear, nose, and throat specialist. He stated, "Had there [been] much more trauma . . . you'd have critically injured this patient."

The victim testified that she was forty-three years old and met the appellant in October 2011 when they both worked at Goodwill. The victim was the asssistant store manager, and the appellant was a "processor" in a four-week career solutions program offered by the company. They married on February 24, 2012. The victim said that she used to use methamphetamine but that she had been "clean" for six years when she met the appellant. In 2005, the victim was convicted of conspiracy to manufacture methamphetamine and possession of drug paraphernalia and served probation.

The victim testified that about two months after she married the appellant, she learned he was using drugs, and she began using drugs. Toward the end of May 2012, she and the appellant began having marital problems, and they separated. The victim said that she still loved the appellant at that time and that they continued to see each other and have sex. The victim said that she was never unfaithful to the appellant but that he accused her constantly of seeing other men and "had this fixation with a recorder." The appellant put the recorder in the victim's car and constantly checked her cellular telephone.

The victim testified that on Friday, October 12, 2012, the appellant telephoned her and said he had some brakes for her car. The appellant wanted her to get them, so the victim drove to a house in Jackson where the appellant was staying, and they decided to go to the Guest House Inn. The appellant gave the victim money for a room, and they spent the night and had sex. The next day, the appellant used drugs. The victim planned to stay in the room Saturday night, and the appellant was going to leave in the victim's car and pick her up the next day. At some point, the appellant left the room as planned, but he returned one or two hours later. The victim allowed him into the room, and he told her that she was going to tell him the truth. The appellant was very aggressive, and the victim knew that "it was fixing to get bad." The appellant threatened to kill the victim and her family, threatened her with brass knuckles, and threatened to burn her with a torch. The victim saw the brass knuckles but did not see a torch. The victim said that the appellant usually threatened her with a knife but that she did not see a knife that day.

The victim testified that the appellant punched her face above her eye and that a large knot formed immediately. He also bit her nose. The victim said that she did not

fight back because she knew the situation would escalate and that the appellant would kill her. At some point, the appellant left in the victm's car to get cigarettes. The victim did not try to leave because she was scared and afraid he would catch her. She said that the appellant would tell her that he was a "ghost" and that he had "eyes everywhere." The appellant returned to the room about ten to fifteen minutes later with L&M cigarettes for himself and Doral cigarettes for her. She said that he started crying and that he insisted she tell him the truth. The victim said that her head was "pounding" from where the appellant had hit her and that she asked if they could rest and talk about it the next morning. They appellant agreed, and they had sex. The victim said that she did not want to have sex with him but that she "agreed to whatever he said." That night, the appellant slept in a chair "right beside" the victim, and the victim slept on the bed. The appellant had her car keys, her cellular telephone, and her money.

The victim testified that the next morning, Sunday, her "whole eye was black." She was upset about her appearance, but the appellant told her she could "cover that up." The appellant told her they were going to leave the motel. As they were walking to her car, he told her not to try to get away from him. The victim said she did not run because "he was right there beside me at this point" and she was scared. The appellant drove toward Huntingdon and pulled into a wooded area near an old shed. He told her that he was going to beat her for three days until she died and that she needed to "practice [her] screams." The appellant punched the victim continuously in her eyes and demanded that she tell him the truth. The victim was bleeding, and clots were coming out of her nose and mouth. The appellant told the victim to get out of the car. When the victim did so, she "hit the ground," and the appellant kicked the side of her face. The appellant gave the victim paper towels to clean her face, told her to get back into the car, and demanded that she tell him the truth. The victim did not know what to tell him, so she told him that she was having sex with her brother. The appellant believed the victim, "was satisfied with that," and told her that she was going to "suck his [d***]." The victim was having trouble breathing due to the congestion of blood but performed fellatio on the appellant. Afterward, he told her that she "better not call the police." The victim said that she was "in a lot of pain," that her "whole head was hurting," and that she was dizzy and disoriented. The victim said she did not feel free to leave at any point during the incident on the field road.

The victim testified that the appellant drove her to his mother's house. When they arrived, the appellant told his mother that the victim "got hit by a truck." The appellant left, and the victim slept on the couch. The next day, Monday, October 15, the victim telephoned the appellant because he had her car. She also called the police. Deputy Meggs arrived, the victim told him what had happened, and he photographed her injuries. The victim said she thought she told him about everything the appellant had done to her, but her eyes and head were her "main concern then." Later that day, the appellant

returned to his mother's house and told the victim that he was going to do something to her brother. The victim called 911, and Deputy Meggs arrived about ten minutes later. The victim ran outside to his patrol car, and the appellant ran away. The victim said that she later saw Investigator Wallace at a gas station and that the officer told her to "go directly to where I was going" and to seek medical attention. The next day, the victim went to the hospital. She said she never followed up with the ear, nose, and throat specialist because she did not have the money. On October 17, the victim had an interview with Investigators Wallace and Bunn and showed them text message she had received from the appellant. She said she felt "really bad" and "was still in a lot of pain" on October 17.

The victim testified that she had listened to the audio recording found in her car. She said that she did not know when the recording started and that it did not record the appellant punching her on the field road. However, it recorded her telling the appellant that she was sleeping with her brother and promising the appellant that she would not call the police. The State played the recording, the length of which was approximately one hour and fifteen mintues, for the jury. At the beginning of the recording, the appellant asked the victim, "Can you get honest with me?" After repeated questioning, the appellant told the victim that she had lied to him, and the victim said, "I'm ashamed of it." The appellant repeatedly demanded to know "who it was," and the victim told him that she had slept with her half-brother and that "it started eight years ago." The appellant asked the victim why she did not let him kill her and stated, "You just couldn't take the beating no more could you?" The appellant told the victim to "suck my [d***]" and that "then you going to take it in the [a**]." The victim could be heard performing fellatio on the appellant. Afterward, he told the victim, "[Y]ou did that like a champ."

On cross-examination, the victim acknowledged that she testified at the appellant's preliminary hearing and that she and the State had reviewed her cross-examination testimony for trial. The victim and the appellant were recovering addicts when they met, and methamphetamine became part of their relationship. The victim acknowledged that she had accused the appellant of cheating on her and that they had talked about divorcing. The victim denied being angry about the appellant's girlfriend, Ashley Hill, but acknowledged that she may have told Hill to stay away from the appellant. The victim and the appellant did not use drugs on Friday, October 12, but the victim consumed alcohol, and they had sex. The next day, the appellant made methamphetamine. After the appellant beat the victim in the motel room, he left to buy cigarettes for both of them. The victim acknowledged that a lot of businesses, including a McDonalds, were nearby and that she did not go to any of them for help or call 911. She also "agreed to have sex" with the appellant that night. She said he did not hit her with the brass knuckles but showed them to her and hit her "with his fist as hard as he could."

The victim testified that after the appellant drove her to his mother's house, she took a shower and went to sleep. The appellant left with the victim's car and cellular telephone, and the victim acknowledged that she called him and asked him to bring her food and her Xanax medication. The appellant returned with the Xanax. The victim said that she did not call 911 that day because the appellant had "beat the utter hell" out of her and she was disoriented. However, she called the police on Monday and saw a doctor on Tuesday. The appellant's mother never offered to take the victim anywhere and did not tell her to get medical attention.

Agent Samantha Spencer, a forensic scientist for the TBI, testified that she received paper towels, L&M cigarette butts, and buccal swabs collected from the appellant and the victim for DNA testing. The testing showed that the victim's blood was on the paper towels and that the appellant's saliva was on the cigarette butts. At the conclusion of her testimony, the State rested its case.

Bobbie Newman, the appellant's mother, testified that the appellant and the victim "would get into it and then they'd break up." On Sunday, October 14, the appellant and the victim arrived at Newman's house about 1:30 p.m., and the appellant was upset and crying. Newman did not see the victim at first because the victim was in the bathroom, and the appellant left before the victim came out of the bathroom. Newman said that after the appellant left, the victim telephoned him "a hundred times or more back to back" and that she heard the victim ask the appellant when he was coming back to get her. The victim told the appellant that he needed to come back and get her because she was hungry and did not have any cigarettes. Newman acknowledged that the victim was angry that the appellant was seeing his girlfriend, Ashley Hill. Newman said that she offered to drive the victim anywhere the victim needed to go but that the victim "didn't want to do anything."

On cross-examination, Newman acknowledged that she thought the victim needed medical attention but that she did not call 911 for the victim. Newman said that she offered to take the victim to the victim's family but that the victim "wouldn't do it."

Ashley Hill testified that on Sunday, October 14, the appellant came to her house and was driving the victim's car. Hill said the victim kept calling the appellant's phone, "saying she was starving." Hill spoke with the victim, and the victim said she wanted Hill to leave the appellant alone and wanted her car back. The victim was very angry with Hill and told Hill that "if she couldn't have those things that [Hill] wasn't either."

On cross-examination, Hill acknowledged that she dated the appellant while she was still married and while the appellant was still married to the victim. On Friday,

October 12, Hill "woke up" with the appellant. She did not see him the next day. On Sunday, October 14, the appellant arrived at her home about 6:00 a.m. He left that afternoon to take the victim some food. Hill acknowledged visiting the appellant in jail and that their conversations were recorded. She said she did not remember telling the appellant, "'You were with me all day. You were with me.'" She said she also did not remember the appellant then telling her, "'No, there has to be a lot more to the story than that. We need to come up with a lot more detail than that.'" The State played a recording of Hill's jailhouse conversation with the appellant, and she acknowleged that they made those statements.

The jury convicted the appellant as charged of especially aggravated kidnapping causing serious bodily injury, a Class A felony; aggravated rape causing bodily injury, a Class A felony; aggravated assault resulting in serious bodily injury, a Class D felony; and evading arrest, a Class A misdemeanor. After a sentencing hearing, the trial court merged the aggravated assault conviction into the aggravated rape conviction and sentenced the appellant to an effective 120 years in confinement to be served at 100%.

## II. Analysis

### A. Motion for the Assistance of Counsel

The appellant contends that the trial court erred by denying his request for private counsel to assist defense counsel at trial and that the court's ruling denied him of his right to a defense. The State argues that the appellant has waived this issue. We conclude that the appellant is not entitled to relief.

On December 11, 2013, five days before trial, defense counsel filed a motion requesting that the trial court allow attorney Benjamin Dempsey to appear as co-counsel at trial. According to the motion, Dempsey's assistance was needed due to "staffing issues" in defense counsel's office. The motion also stated that Dempsey's appearance "will neither hinder nor delay the prosecution in this case" and that Dempsey had agreed to assist with the case pro bono. On December 13, 2013, defense counsel filed a second motion, requesting to withdraw the previous motion. That same day, counsel filed a third motion, again requesting that Dempsey be allowed to appear as co-counsel. The third motion omitted the need for Dempsey's assistance due to staffing issues but maintained that Dempsey's appearance would neither hinder nor delay the State's case and that Dempsey had agreed to assist with the case pro bono. On January 10, 2014, the trial court filed a written order stating that it held an evidentiary hearing on December 13, 2013, that "[t]he findings and rationale of the Court were announced from the bench," and that it denied the appellant's third motion.

In his appellate brief, the appellant claims that the trial court "articulated as a basis of his denial, that Ben Dempsey was not adequately prepared and that his participation would weaken the defense and also build into the record an ineffective assistance of counsel claim, . . . and that allowing his participation would be bad public policy." The brief cites to "Transcript of Motions, Pages 36-44." However, as noted by the State, no such transcript is in the appellate record. As this court has repeatedly stated, it is the appellant's duty to prepare a record which conveys a fair, accurate, and complete account of what transpired in the trial court which forms the basis of his appeal. See Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Without a transcript of the hearing, which would have included the parties' arguments, the evidence presented, and the trial court's oral findings, we cannot consider the merits of the issue.

Moreover, although the appellant now claims that the trial court's denial of his motion denied him of his right to a defense, he does not cite any authority in support of that proposition. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). In any event, the appellant has failed to explain how Dempsey's not being present at trial actually prejudiced his defense. See Tenn. R. App. P. 36(b). Therefore, he is not entitled to relief.

## B. Serious Bodily Injury

The appellant contends that although the victim's injuries "looked severe and were painful," they do not rise to the legal standard of "serious bodily injury." The State argues that the evidence was sufficient for the jury to conclude that the victim suffered serious bodily injury. We agree with the State.

In effect, the appellant is arguing that the evidence is insufficient to support his convictions of especially aggravated kidnapping and aggravated assault. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958

S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, especially aggravated kidnapping is defined as false imprisonment where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-305(a)(4). False imprisonment is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). Aggravated assault occurs when a person intentionally or knowingly causes serious bodily injury to another person. Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(i), -101(a)(1). "Serious bodily injury" is defined as a bodily injury that involves:

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement;

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F) A broken bone of a child who is eight (8) years of age or

less.

Tenn. Code Ann. § 39-11-106(a)(34); see also State v. Michael Farmer, 380 S.W.3d 96, 101-02 (Tenn. 2012). "Bodily injury," however, "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Id. § 39-11-106(a)(2). As this court has explained,

> While the phrase "serious bodily injury" . . . is not susceptible to precise legal definition, it must describe an injury of a greater and more serious character than that involved in a simple assault. The distinction between "bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law.

State v. Barnes, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997).

Initially, we note that the appellant again has failed to cite to any authority in support of his claim. Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). Regardless, we conclude that he is not entitled to relief.

The State argues that the proof shows "serious bodily injury" because the victim suffered extreme physical pain and obvious disfigurement. We agree with the State. At trial, the victim testified that the appellant punched her continuously in her eyes. He then ordered her out of her car. She fell to the ground, and he kicked the side of her face. A CT scan showed multiple fractures to the victim's right sinus and right orbital bone, and her right maxillary sinus was filled with blood. Dr. Spanos described the victim's injuries as severe and acknowledged that she was fortunate to have survived. The victim said that she was in a lot of pain," that her "whole head was hurting," and that she was dizzy and disoriented. Two days after the incident, the victim still described her pain as "seven out of ten," and she received hydrocodone pills and a Toradol injection for pain. The subjective nature of pain is a question of fact to be determined by the jury. State v. Chester Dale Gibson, No. M2005-01422-CCA-R3-CD, 2006 WL 770460, at *11 (Tenn. Crim. App. at Nashville, Mar. 24, 2006). Moreover, photographs taken by Deputy Meggs the day after the beating showed that the victim's eyes were not only severely bruised and swollen but that her right eye was swollen shut. Photograph taken two days later showed that her eyes remained black and swollen and that the entire right side of her face was bruised and swollen. We note that the victim's injuries were very similar to those in another case in which we said that the evidence was sufficient to show that the victim suffered extreme physical pain and obvious disfigurement. See id. at *12. Thus, we conclude that the evidence is sufficient to support the jury's finding that the victim

suffered serious bodily injury.

## C. Excessive Sentence

The appellant contends that his effective 120-year sentence to be served at 100% is excessive. The State argues that the trial court properly sentenced the appellant. We agree with the State.

Andy Dickson, the Sheriff of Carroll County, testified that he began working for the CCSD in December 1990. He said that since that time, the appellant had "either been in our custody, or somebody else's custody or we've been looking for him to put him in custody." He acknowledged that the appellant had been arrested fifteen times since 1995 and that some of those arrests occurred while the appellant was on probation or bond. Sheriff Dickson described the appellant as "one of the most dangerous individuals I've dealt with in my 20-plus-year career in law enforcement." He stated that the appellant did not care whether his actions hurt anyone and that the appellant had no regard for anyone other than himself. Sheriff Dickson said he had "[n]o doubt" the appellant would continue to commit crimes in which the risk of life was high.

On cross-examination, Sheriff Dickson testified that he had known the appellant since high school. He acknowledged that the appellant had been involved in using and selling drugs and that many of the appellant's criminal behaviors were drug-related. On redirect examination, Sheriff Dickson testified that in 2002, an order of protection was issued to the appellant's then-wife.

Officer Lee Bates of the CCSD testified that on August 19, 2004, he was looking for the appellant for failing to appear in court. Officer Bates saw the appellant on Highway 424 and attempted to stop him, but the appellant ran from his vehicle and into a wooded area. Officer Bates and another officer chased the appellant and found him hiding in a brush pile. Officer Bates jumped on the appellant, a fight ensued, and Officer Bates's finger was broken. He said that during the time he had known the appellant, the appellant "has escalated time after time to where he's become very dangerous." Officer Bates stated, "I'm very cautious of him anytime I've been around him because I know that he's capable of hurting somebody and probably would hurt somebody if he had the opportunity." On cross-examination, Officer Bates acknowledged that he had never known the appellant to point a gun at law enforcement.

Captain Johnny Hill of the Huntingdon Police Department testified that on December 13, 1995, the appellant and four other people went to a residence, forced their way inside, and held two men and one woman at gunpoint. They also beat the two men with "a 2-by-4." The appellant pled guilty to three counts of aggravated assault and one

count of aggravated burglary. On January 15, 2000, Captain Hill was present during the execution of a search warrant at the appellant's residence and found that methamphetamine was being manufactured. The appellant pled guilty and received a four-year sentence. On August 12, 2004, Captain Hill responded to a call about a person in Walmart with a gun. Captain Hill went to the store and saw a pistol in the appellant's pocket. Captain Hill and another officer approached the appellant, the appellant scuffled with them, and the officers took the gun from him. The gun was loaded.

Investigator Marvin Rodish of the Jackson Police Department (JPD) testified that in June 2012, he responded to a call by the victim. When he arrived at the victim's residence, the victim was upset and afraid and said that the appellant had assaulted her and may have used a weapon. The victim had multiple bruises on her body and two marks behind her right ear. The marks looked like they had been made by a bladed object or a cutting utensil. Investigator Rodish identified photographs of the victim's injuries. On cross-examination, Investigator Rodish testified that no charges were filed against the appellant.

Officer Adam Rogus of the JPD testified that the day after Investigator Rodish responded to the victim's call, he also responded to a call by the victim. When he arrived, the victim was standing outside her home. The front door was open, and the victim was afraid to go inside the home. The victim told him that the appellant might be inside and asked that the officer "clear" the residence. Officer Rogus entered the home and saw a sword. The victim said the sword "was used in an assault from her husband," and Officer Rogus collected the sword as evidence.

Investigator Andrew Smith of the Madison County Sheriff's Department testified that on October 17, 2012, he assisted Carroll County officers with arresting the appellant. After the arrest, a female advised officers that a methamphetamine laboratory was in the back of a pickup truck parked at the residence. Investigator Smith later obtained video from Walgreens, showing the appellant buying items used to manufacture methamphetamine. Investigator Smith said that charges related to manufacturing methamphetamine were pending against the appellant. On cross-examination, Investigator Smith testified that the truck did not belong to the appellant and that the home where the appellant was arrested belonged to "a girl that [the appellant] was seeing named Misty Cross."

The victim testified that in June 2012, the appellant raped her and used his open hand to beat her in their home. The appellant had threatened the victim with a sword "a couple of times," but she did not remember if he used the sword on that occasion. After the assault, the victim telephoned the police. Days later, she called the police back to the residence because she found her window open. She gave the sword to the police but did

not pursue charges against the appellant because she was scared. On cross-examination, the victim testified that she continued to have sex with the appellant after the June 2012 assault.

At the conclusion of the victim's testimony, she read a statement to the trial court. In the statement, the victim said that the appellant destroyed everything she had worked for in her life and that rebuilding her life had been difficult since his "ungodly abuse." She stated that if the appellant got the opportunity, he would kill her. She said that she had been faithful and "extremely good" to the appellant and that all she got in return was "horrible abuse."

The State introduced the appellant's presentence report into evidence. According to the report, the then forty-three-year-old appellant was still married to the victim but had been divorced twice and had three children. In the report, the appellant described his childhood as "great" but said marriage "sucks." He described his mental health as "good" but his physical health as "fair" due to hepatitis C and diabetes. He said in the report that he dropped out of high school after the eleventh grade but obtained his GED, that he had used non-prescribed and illegal drugs but received alcohol and drug treatment from August 2011 to January 2012, and that he had been employed as a roofer for most of his adult life. The appellant's criminal history spanned more than four pages of the report and included convictions of aggravated burglary, aggravated assault, possession of a weapon by a convicted felon, criminal impersonation, failure to appear, driving on a revoked license, driving under the influence, contributing to the delinquency of a minor, receiving stolen property, weapon offenses, traffic offenses, and felony and misdemeanor drug offenses.

The trial court stated that it had considered the evidence at trial and sentencing, the presentence report, the principles of sentencing, the arguments made by the parties, the nature and characteristics of the criminal conduct, and the enhancement and mitigating factors. The court found the appellant to be a Range III, career offender and applied the following enhancement factors to his sentences: (1), that "the defendant has a previous history of criminal convictions or behavior in addition to that necessary to establish the appropriate range"; (5), that the defendant treated the victim with exceptional cruelty during the commission of the offense; (7), that the offense was committed to gratify the defendant's desire for pleasure or excitement; (8), that the defendant failed to comply with conditions of a sentence involving release into the community before trial or sentencing; (10), that the defendant had no hesitation about committing a crime when the risk to human life was high; (11), that the "felony resulted in death or serious bodily injury, or involved the threat of death or serious bodily injury, to another person, and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury"; and (13), that at the time the felony was committed, the defendant was on

supervised release. Tenn. Code. Ann. § 40-35-114(1), (5), (7), (8), (10), (11), (13). The court applied no mitigating factors.

The trial court found that the appellant was physically and emotionally capable of serving his sentences in confinement, that his social history was poor, and that he had no chance of rehabilitation. The court stated that the circumstances of the offenses were "egregious" and that there was a high risk of the appellant committing future crimes. The trial court noted that measures less restrictive than confinement had been unsuccessful in deterring the appellant and that a substantial period of confinement was needed to deter him and others.

The trial court merged the appellant's aggravated assault conviction in count three into his aggravated rape conviction in count two and sentenced him to sixty years for especially aggravated kidnapping and sixty years for aggravated rape, the maximum punishment in the range for a Class A felony. See Tenn. Code Ann. § 40-35-112(c)(1). The court noted that the appellant had to serve the sentences at 100% less sentence credits earned. See Tenn. Code Ann. § 40-35-501(i)(C), (F). The court sentenced him to eleven months, twenty-nine days to be served at seventy-five percent for evading arrest. Regarding consecutive sentencing, the trial court found the appellant to be an offender whose record of criminal activity was extensive, that he was a "dangerous offender," and that he was being sentenced for offenses committed while on probation. See Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). The court ordered that the appellant serve the sixty-year sentences consecutively but that he serve the misdemeanor sentence concurrently with the other two for a total effective sentence of 120 years. The trial court concluded the hearing by stating that it "means to confine Mr. Cary so that he will never again threaten a free person" and that "Mr. Carey, you are the reason that we must have prisons."

Ordinarily, "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). However, in this case, the trial court found the appellant to be a career offender. Therefore, the court was required to impose the maximum sentence within the applicable Range III and properly sentenced the appellant to sixty years for each of the Class A felonies. See Tenn. Code Ann. § 40-35-108(c).

As to consecutive sentencing, our supreme court again has held "that the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive

sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

Here, the trial court imposed consecutive sentencing upon finding three applicable criteria: that the appellant had an extensive criminal history, that he was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," and that he was being sentenced for offenses committed while on probation. Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). The first or third criteria alone justified consecutive sentencing in this case. In any event, our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The trial court's statements clearly demonstrate that it found the Wilkerson factors applicable in this case. Therefore, the trial court did not abuse its discretion by imposing consecutive sentencing.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE